# 2007 DTA 95

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN Y HUMACAO**
**PANEL V**

PUEBLO INTERNATIONAL, INC.
Demandante-Recurrida

v.

RIO GRANDE INVESTMENT, LLC Y PLAZA SAN FRANCISCO INVESTMENT, LLC.
Demandados-Peticionarios

Núms. Cons. KLCE-2007-01120 / KLCE-2007-01128

San Juan, Puerto Rico, a 2 de agosto de 2007

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Salas Soler y la Juez Velázquez Cajigas

Arbona Lago, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

Atendido que los recursos del epígrafe, presentados ambos el 30 de julio de 2007, tratan sobre un mismo asunto y se recurre de una misma **Resolución y Orden** dictada el 11 de julio de 2007 en la causa KPE2001-0505 (908), ante el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), procedemos a consolidarlos para su atención y disposición.

Mediante escrito de oposición presentado el 31 de julio de 2007, *"Pueblo"* argumentó en contra de la Petición de *Certiorari* y mociones urgentes en auxilio de jurisdicción radicados por Río Grande Investment, LLC / Plaza San Francisco Investment, LLC (*"Río Grande"*) en la causa KLCE-2007-01120 y adoptó como su oposición, por integra referencia, los escrito presentados por Pueblo Internacional, LLC (*"Pueblo"*) en la causa KLCE-2007-01128.

*"Pueblo"* ataca la autorización del TPI para que *"Río Grande"* embargue propiedad inmueble de *"Pueblo"* por suma alguna, así como la solicitud de *"Río Grande"* ante este foro de apelación intermedia, para que se reduzca el monto de la fianza requerida para embargo, de $8,000,000.00 a $250,000.00. *"Pueblo"* no solicita reducción alguna al monto de la fianza requerida por el TPI para autorizar su embargo inmobiliario de $12,000,000.00 contra *"Río Grande"*.

### II

De autos consta que el litigio ante el hermano foro de instancia dio inicio en o para mediados del 2001. La parte demandada, *"Río Grande"* contestó y reconvino contra *"Pueblo"*.

El 6 de marzo de 1998 *"Pueblo"* y *"Río Grande"* suscribieron un Contrato de Opción a Compra (*"Contrato de Opción"*) mediante el cual *"Río Grande"* como optante y *"Pueblo"* como optatario pactaron sobre 44.4052 cuerdas de terreno sito en el Municipio de Río Grande y registralmente comprendida en tres parcelas de 43.2650, .7079 y .4323 cuerdas. (Ap. KLCE-2007-01120, pág. 443)

Conforme a las alegaciones, la cláusula undécima del *"Contrato de Opción"* en lo aquí pertinente dispuso que de ejercitarse la opción y finalmente otorgarse la correspondiente compraventa entre *"Pueblo"* (como vendedor) y *"Río Grande"* (como comprador):

*"[...]* *"If Purchaser [Plaza San Francisco] receives an offer (as used in this clause (a), an "offer") from any to lease space on the Property for the operation of a supermarket, grocery store hypermarket, warehouse club or other similar store, then Purchaser shall offer such space in writing to Seller for the operation of a supermarket on terms and conditions no less favorable than those contained in the Offer". [...]".*

(Ap. KLCE-2007-01120, pág. 444)

El contrato de compraventa entre *"Pueblo"* y *"Río Grande"* fue otorgado el 7 de octubre de 1998 y ambas entidades en algún momento iniciaron negociaciones encaminadas a un contrato de arrendamiento de un local comercial, para establecer un Super Colmado Pueblo en un local del Centro Comercial planificado por *"Río Grande"*, dentro del terreno antes señalado.

Así las cosas y conforme surge de la *"Demanda Enmendada"* presentada por *"Pueblo"* ante el TPI el 28 de enero de 2004, se alegó lo siguiente:

*"[... .. ...]*

*28. Kmart Corp. ("Kmart") le arrendó a Río Grande Investment un local de 115,000 pies cuadrados en el Centro Comercial, en el cual Kmart operaría una tienda Big Kmart. Esta tienda se ubicaría en local justamente al lado del local que Río Grande Investment le arrendó a Pueblo mediante el Contrato de Arrendamiento.*

*29. En algún momento de diciembre de 2000, ya existiendo el Contrato de Arrendamiento entre Pueblo y Río Grande Investmen, Kmart le solicitó a Río Grande Investment arrendar unos 65,000 pies cuadrados adicionales y así aumentar el local arrendado de 115,000 cuadrados a 180,000 pies cuadrados.*

*30. El espacio adicional era requerido por Kmart para operar en el local de 180,000 pies cuadrados una tienda "SuperKmart", que es un supermercado y una tienda por departamento dentro del mismo local.*

*31. A pesar de que esta solicitud de Kmart constituye una "oferta" que activa la obligación establecida en la cláusula undécima del Contrato de Opción, por ser un SuperKmart tanto un supermercado como un hipermercado ("hipermarket"), o una tienda similar a éstas, Río Grande Investment ofreció, y se negó a ofrecer el espacio a Pueblo, bajo los mismos o mejores términos de la oferta de Kmart, según requiere la referida cláusula undécima.*

*32. Pueblo se enteró de esta solicitud de Kmart, pues el señor Torres Caratini se lo informó al Lcdo. Fernando Bonilla y al Lcdo. Salvador Casellas Toro en la reunión que sostuvieron el 29 de enero de 2001.*

*33. Por información y creencia, los 65,000 pies cuadrados adicionales que Río Grande Investment pretendió arrendar a Kmart incluyen el local que Río Grande Investment le arrendó a Pueblo mediante el Contrato de Arrendamiento. Ello así, pues la propuesta tienda Big Kmart, que cuenta con 115,000 pies cuadrados, sólo puede físicamente expandirse 65,000 pies cuadrados adicionales hacia el área donde ubicará el local*

*arrendado a Pueblo. Ello explica porqué, desde principios de diciembre de 2000, Río Grande Investment se ha negado a firmar el Contrato de Arrendamiento y a reconocer la existencia del mismo, a pesar de que se han acordado todos los términos y no existe nada más por negociar.*

*34. Posteriormente, Kmart decidió no arrendar el local en el centro comercial.*

**D. Las negociaciones con Pitusa**

*35. En o alrededor de octubre de 2003, Río Grande arrendó o vendió a una entidad afiliada o relacionada a las empresas Pitusa ("Pitusa") el local en el centro comercial que había acordado arrendarle a Pueblo, y que posteriormente interesó arrendar a Kmart, para que allí se estableciera un hipermercado Pitusa, que es supermercado y tienda por departamento dentro del mismo local.*

*36. Ni Río Grande Investment ni San Francisco Investment informaron verbalmente o por escrito a Pueblo sobre la oferta de arrendamiento que hicieran a Pitusa con respecto al local ubicado en el centro comercial, y mucho menos le ofrecieron un arrendamiento de dicho local.*

*37. Las actuaciones y omisiones por parte de Río Grande Investment y/o San Francisco Investment constituyen una violación al acuerdo al cual habían llegado Río Grande Investment y Pueblo para el arrendamiento del local y a la cláusula undécima que surge del contrato de opción que dispone que: "If Purchaser receives an offer (as used in this clause (a), an "Offer") from any to lease space on the Property for the operation of a supermarket, grocery store **hypermarket,** wharehouse club or other similar store, then Purchaser shall offer such space in writing to Seller for the operation of a supermarket on terms and conditions no less favorable than those container in the Offer". [...]".*

(Ap. KLCE-2007-01120, págs. 448-450)

Por su parte, en la Reconvención de *"Río Grande"* se alega de la siguiente manera:

*"[... .. ...]en la Opción, Pueblo tendría el derecho de "tanteo" de arrendamiento si San Francisco recibía una oferta para el arrendamiento de cualquier espacio en la propiedad para la operación de un supermercado, tienda de comestibles, hipermercado, tienda de almacén por membresía, o tiendas similares. El referido derecho le permitía a Pueblo considerar e igualar ofertas de arrendamiento que recibiera San Francisco durante el término de la Opción, ahorrándole a Pueblo el tiempo y gastos relacionados con la posible negociación de dichos términos, y facilitando la posibilidad de que Pueblo se convirtiera en el inquilino ancla ("anchor tenant") del centro comercial si así lo interesaba.*

*4. La Opción consideró expresamente el tema de la supervivencia de algunas de sus obligaciones una vez se efectuara la compraventa, pero excluyó a tal efecto al derecho de tanteo, no disponiendo que éste sobreviviría la extinción de la Opción si se efectuaba la compraventa. La Opción fue ejercitada directamente por San Francisco mediante carta del 3 de abril de 1998. Con anterioridad a la compraventa (la cual se llevó a cabo seis meses después), San Francisco le notificó a Pueblo que la propiedad sería comprada por la demanda Río Grande. Ni Pueblo ni sus abogados exigieron que Río Grande asumiera los derechos u obligaciones de la Opción, ni que suscribiera una obligación independiente de ofrecer la propiedad en arrendamiento a Pueblo, ni que se pactara que el derecho de tanteo previamente conferido sobreviviría a la compraventa. Al confirmarse que se procedería al desarrollo del centro comercial una vez se efectuara la compraventa, Pueblo no desplegó interés en ser inquilino ancla o arrendatario en la propiedad.*

*5. La propiedad fue comprada por Río Grande el 7 de octubre de 1998 mediante Escritura de Agrupación y Compraventa, en la cual Pueblo le vendió a Río Grande "sin limitaciones" ("without any limitation*

*whatsoever"), salvo por un derecho de retracto ("right of repurchase") por la Autoridad de Tierras de una porción de la propiedad. Río Grande, entidad independiente a San Francisco aunque filial de la misma, no adquirió ni asumió al momento de la compraventa obligaciones de tanteo y otras que afectaran el inmueble, salvo las reflejadas en la escritura de compraventa, ni mediante cesión, contrato, escritura o de forma alguna.*

*6. Poco después de firmar la Opción, San Francisco comenzó a buscar un inquilino "ancla" para el centro comercial. Al hacérsele un acercamiento a Kmart, dicha compañía reaccionó favorablemente y señaló que ya tenía una propuesta de plano de ubicación que había preparado cuando Pueblo le había hecho un acercamiento en relación a la misma propiedad. La disponibilidad de Kmart ofreció un importante inquilino ancla para el centro comercial y viabilizó el financiamiento del mismo.*

*7. Una vez Río Grande adquirió la propiedad, negoció y llegó a un acuerdo de arrendamiento con Kmart que fue suscrito por las partes el 8 de septiembre de 1999 (el "Contrato de Kmart"). Ello convirtió a Kmart en el inquilino ancla del Centro Comercial Plaza Río Grande, concediéndosele varios derechos y preferencias contractuales como tal. La construcción por Río Grande del Local que ocuparía Kmart en dicho centro comercial comenzó en los inicios del año 2000.*

*8. El Contrato de Kmart requiere que Río Grande desarrolle el centro comercial de forma consistente con la anticipada en dicho Contrato, que construya un edificio y se lo arriende a Kmart, debiéndose proveer también una cantidad mínima de estacionamientos en áreas aledañas. El proceso de construcción del edificio está sustancialmente definido en el Contrato, y la construcción de estructuras distintas a las reflejadas en los planos sometidos a Kmart requiere la autorización de dicha compañía Dicho derecho de controlar la configuración de los edificios dentro del centro comercial se conoce como "site control" o "footprint control", y es un derecho que se le confiere en algunas ocasiones a los arrendatarios ancla. Junto a dicho derecho, el Contrato de Kmart le confirió a dicha compañía el derecho a expandir sus facilidades físicas en el centro comercial hacia el área aledaña.*

*9. El Contrato de Kmart no restringe de forma alguna el tipo de mercancías que puede vender dicha compañía en sus facilidades, habiéndose contemplado que Kmart vendería mercancías comestibles, delicatessen y efectos de farmacia, entre muchos otros. [... .. ...]".*

(Ap. KLCE-2007-01120, págs. 46-49)

*"[... .. ...]*

*36. También mediante carta de fecha 5 de febrero de 2001 enviada por Fernando Bonilla de Pueblo a Charles Conaway, presidente y principal oficial ejecutivo de Kmart, Pueblo formalmente le informó a Kmart entre otras cosas que había llegado a un acuerdo final con Río Grande, y que se había enterado por el Sr. Torres Caratini que Kmart había solicitado unan expansión en el Centro Comercial de Río Grande para abrir un "Super Kmart." En dicha carta, Pueblo alegó expresamente que tenía, a tenor con la Opción, el derecho de decidir si deseaba arrendar de Río Grande el espacio solicitado por Kmart a términos no menos favorables a los ofrecidos por ésta por un "supermarket, grocery store, hypermarket, warehouse club or other similar store".*

*37. En su carta, Pueblo le indicó además a Kmart:*

*A Super Kmart store is clearly a "supermarket, grocery store, hypermarket, warehouse club or other similar store". However, Pueblo has not received the written offer required by the "First Option to Lease" clause. If the information confirmed by Mr. Torres Caratini materializes in fact, then this will be the seventh retail location in which Kmart is tortiously interfering with Pueblo's contractual rights.*

*This letter serves as a notice to Kmart that **proceeding with the execution of the expansion plan in the Río Grande Shopping Center in which Kmart would operate a Super Kmart store, would violate the "First Option Clause"**, and therefore, would constitute a tortious interference on the part of Kmart.*

*(Énfasis suplido)*

38. *Al escribir y remitir su carta del 5 de febrero a Kmart, Pueblo sabía a ciencia cierta que el tema del derecho de Kmart a vender todo tipo de productos de supermercado en sus facilidades bajo construcción, o en cualquier expansión de ellas, había sido plenamente discutido por las partes, y que Pueblo había reconocido inequivocamente los derechos de Kmart en los últimos borradores intercambiados entre Pueblo y Río Grande, eliminado todo tipo de objeción a que Kmart vendiera productos de supermercado si expandía sus facilidades.*

39. *Al escribir y remitir su carta del 5 de febrero a Kmart, Pueblo también sabía a ciencia cierta que Pueblo y Río Grande no habían llegado a un acuerdo final de arrendamiento que fuera vinculante entre las partes. Además de todos los asuntos que así lo señalan y que quedaban por negociar o resolver, tal y como se relatan anteriormente en este escrito, Pueblo sabía que la intención de las partes reflejaba inambiguamente en los borradores del contrato era que sólo habría un acuerdo vinculante una vez el contrato final fuera sucrito por ambas partes. De hecho, el propio borrador de fecha "December 11, 2001" que nunca fuera remitido a Río Grande y que fuera anejado por Pueblo a su "Moción en Cumplimiento de Orden y Réplica a Oposición a Solicitud de Interdicto Preliminar" radicada en o alrededor del 4 de abril de 2001 dispone en su sección 41(e) a la pág. 37:*

*[... .. ...]".*

(Ap. KLCE-2007-01120, págs. 58-59)

Es dentro de este contexto, expuesto a grandes rasgos con el sólo propósito de ubicar el complejo litigioso, que ambos litigantes solicitaron del TPI sendas órdenes de embargo preventivo en aseguramiento de posibles sentencias por las sumas de $12,000,000.00 ("*Pueblo*") y $8,000,000.00 ("*Río Grande*"), al amparo de las disposiciones de la Regla 56 de Procedimiento Civil, 32 LPRA Ap. III, R. 56.

Luego de vista al efecto, el ilustrado foro de instancia dictó Resolución y Orden el 11 de julio de 2007, en la que al amparo de las disposiciones de la Regla 56.3 de Procedimiento Civil, 32 LPRA Ap., R. 56.3, requirió a ambas partes la prestación de fianza por iguales montos a sus solicitudes de embargo, para responder por los daños que pudiera causar dichos afianzamientos a cada parte afectada. Además, dispuso que:

*"[... .. ...]*

*(2) Simultáneamente con la consignación de la fianza ordenada en el inciso que antecede, las partes presentarán, mediante sendas mociones limitadas a esos efectos, los estudios de título juramentados[2] donde especifiquen las propiedades de la parte contraria donde interesan se anote el embargo. Esto será indispensable para poder expedir el mandamiento de embargo, a menos que las partes puedan ponerse de acuerdo en torno a los bienes cuyo embargo les sea menos oneroso.*

*(3) Simultáneamente con la consignación y con la presentación de la prueba antes detallada, ambas partes presentarán sus respectivos proyectos de orden y mandamiento, dirigidos al Registrador de la Propiedad, para nuestra consideración y firma[3].*

*El incumplimiento de lo aquí ordenado por las partes conllevará la denegatoria automática de su solicitud*

*de embargo preventivo, ya que el Tribunal entenderá que dicha parte ha desistido de su reclamación. [... ... ...]".* (Nota al calce suprimida)

(Ap. KLCE-2007-01120, págs. 58-59)

Ambas Peticiones de *Certiorari* están acompañadas de mociones en auxilio a nuestra jurisdicción. La de *"Río Grande"* hace amplia referencia a *"...las aparentes enajenaciones que "Pueblo" hace de sus activos y la necesidad de otros acreedores de recurrir a los tribunales a solicitar protección para sus créditos...".* (Muy Urgente Moción Complementaria A Solicitud de Orden en Moción de Jurisdicción" y la de *"Pueblo"*, arraigada en que *"...Río Grande Investment debe presentar estudios de títulos juramentados de la propiedades inmuebles de Pueblo... antes del 2 de agosto de 2007."*, para que junto a la señalada fianza proceda a dictarse la Orden de Embargo, así como la alta probabilidad que entiende existe en la disposición favorable del pleito, porque *"Río Grande"* no ha demostrado probabilidad de prevalecer ni acreditó monto alguno de daño.

En las respectivas Peticiones de *Certiorari,* los señalamientos de error son los siguientes:

*"KLCE-2007-01120 ("RIO GRANDE")*

*ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL IMPONER UNA FIANZA DE OCHO (8) MILLONES DE DÓLARES PARA GARANTIZAR UNA ANOTACIÓN PREVENTIVA DE EMBARGO, SIN PROHIBICIÓN DE ENAJENAR, EN GARANTÍA DE UNA SENTENCIA POR LA MISMA SUMA DE OCHO (8) MILLONES DE DÓLARES; REQUERIMIENTO EXHORBITANTE QUE NO FUE APOYADO EN NINGÚN CRITERIO QUE SOSTENGA TAL PROYECCIÓN DE POSIBLES DAÑOS POR EMBARGO ILEGAL.* (Mayúscula en el original)

*KLCE-2007-01128 ("PUEBLO")*

*A. PRIMER ERROR: Erró el Honorable Tribunal de Primera Instancia al Declarar Con Lugar la Solicitud de Embargo de Río Grande Investment Toda Vez que Ésta No Probó tener Probabilidades de Prevalecer en los Méritos de sus Causas de Acción Contra Pueblo.*

*B. SEGUNDO ERROR: Erró el Honorable Tribunal de Primera Instancia al Declarar Con Lugar la Solicitud de Embargo de Río Grande Investment Sin Hacer Determinaciones de Hechos Sobre la Prueba Desfilada en la Vista para Considerar Dicha Solicitud.*

*C. TERCER ERROR: Erró el Honorable Tribunal de Primera Instancia al declarar Ha Lugar la Solicitud de Embargo de Río Grande Investment, Toda Vez que Ésta No Presentó Prueba Alguna que Acredite el Monto de sus Daños."*

## Exposición y Análisis

Pronosticar con algún grado de certeza el resultado de un pleito ante el foro judicial siempre ha sido, es y será tarea compleja y ciencia muy imprecisa. A ello responde el refrán: *"No basta con tener la razón, hay que poderla probar y que se la den".*

No obstante, el ordenamiento procesal interesa evitar, en todo lo posible, que el dictamen judicial final se reduzca a un pronunciamiento meramente académico, por lo que ha de favorecer las medidas justas y adecuadas de afianzamiento preventivo y de ser necesario luego en ejecución, con las correspondientes salvaguardas.

Precisamente, a ello responden dos extensas Reglas de Procedimiento Civil, como lo son las Reglas 56 y

247

51, 32 LPRA Ap. III, R. 56 y 51. La Regla 56.1, *supra*, dispone:

*"En todo pleito antes o después de sentencia, por moción del reclamante, el tribunal podrá dictar cualquier orden provisional que sea necesaria para asegurar la efectividad de la sentencia. El tribunal podrá conceder el embargo, el embargo de fondos en posesión de un tercero, la prohibición de enajenar, la reclamación y entrega de bienes muebles, la sindicatura, una orden para hacer o desistir de hacer cualesquiera actos específicos, o podrá ordenar cualquier otra medida que estime apropiada, según las circunstancias del caso. En todo caso en que se solicite un remedio provisional, el tribunal considerará los intereses de todas las partes y dispondrá según requiera la justicia sustancial. (Énfasis suplido).*

*El embargo de bienes es una medida realista y necesaria consagrada procesalmente en nuestra Regla 56 de Procedimiento Civil encaminada a preservar la capacidad económica de un deudor y, en consecuencia, permitir a un acreedor en última instancia vindicar su derecho. Esta regla provee un balance delicado e impone sobre los tribunales el deber de velar sobre la razonabilidad del remedio sobre todas las partes y representa "...la garantía máxima de corrección y resguardo de los derechos del deudor...". Domínguez Talavera v. Tribunal Superior, 102 D.P.R. 423 (1974). Tal protección, en casos de reclamaciones no evidenciadas por documentos públicos o privados debidamente autenticados o por sentencia judicial, exige la prestación de una fianza para garantizar posibles daños y perjuicios."*

*Fresh-O-Baking Co. v. Molinos de P.R.,* 103 DPR 509, 519 (1975). (Énfasis suplido)

Todo embargante en un pleito siempre será responsable de los daños y perjuicios que el aseguramiento pueda causar, si finalmente resulta expúreo (ilegal o indebido) porque la parte embargante no prevalezca en el litigio o el aseguramiento resulte excesivo. Debido a tal posible eventualidad el ordenamiento procesal requiere de la prestación de fianza prestada por un tercero idóneo, como garantía de cumplimiento, en casos como el presente. Véase Regla 56.3 de Procedimiento Civil, 32 LPRA Ap. III, R. 56.3. *Pereira v. Reyes De SIMS,* 126 DPR 220, 226 (1990).

Por tanto, es norma en esta jurisdicción que:

*"Al fijar la fianza para el embargo, el tribunal debe ponderar una serie de factores, entre los cuales pueden sugerirse los siguientes: cuán fundamental es la utilidad que el bien a embargarse sirve al demandado; la solidez de los fundamentos que prima facie sostienen la reclamación del demandante; y si el aseguramiento solicitado es el menos oneroso para garantizar la efectividad de la sentencia que pueda recaer. Todo esto atendiendo el mandato de la Regla 56.3 de estimar los posibles daños que se causarían al demandado y a la exigencia de la Regla 56.1 en cuanto prescribe que se de consideración a los intereses de todas las partes según lo requiera la justicia sustancial. Mantenemos así un principio antiguo en esta jurisdicción, cual es, que se garanticen los derechos del reclamante de la manera menos gravosa para el demandado."*

*Vda. De Galindo v. Carro,* 108 DPR 277, 282 (1979) (citas y nota al calce suprimidas).

Dentro de tal esquema, el ordenamiento procesal siempre ha concedido amplia flexibilidad al tribunal para dictar las medidas que estime apropiadas y convenientes para el aseguramiento de una posible sentencia futura a favor del litigante que interese tal providencia, según las circunstancias de cada caso y considerados los legítimos intereses de todas las partes en el litigio. *F.D. Rich Co. v. Tribunal Supremo,* 99 DPR 158, 176 (1970).

Consta de autos que el TPI tomó cuidado en sopesar todos los intereses en litigio y luego de audiencia al respecto, en la Resolución del 11 de julio de 2007, aquí recurrida, señaló:

"*[... .. ...]*

*De lo anterior surge que al evaluar la procedencia de una solicitud de embargo preventivo, debemos hacer una determinación sobre las probabilidades de prevalecer del promovente [Río Grande] y de esa manera, disminuir el riesgo de hacer una determinación errónea. **Resolvemos que en el presente caso, tanto Pueblo como Río Grande establecieron, mediante prueba documental y testifical, la probabilidad de prevalecer en sus respectivas causas de acción. (Énfasis suplido)*"*

(Ap. KLCE-2007-01120, pág. 3)

Finalmente, el ilustrado foro de instancia concluyó que bajo la premisa de embargo de bienes muebles, sin que medie prohibición de enajenar, requirió de "*Río Grande*" prestar una fianza de 8 millones para embargar bienes muebles de "*Pueblo*", por igual cantidad.

Como se sabe, aunque el monto económico de la orden de embargo es factor importante en la ecuación para arribar al momento de la fianza, el primero no es matemáticamente controlante, cuando se trata de fianza para embargar. A este respecto la "*...situación requiere que el demandante embargante preste una fianza suficiente para enjugar los daños y perjuicios que pueda sufrir el demandado como consecuencia del embargo.*" *Vda. de Galindo v. Carro, supra*, pág. 282.

De autos consta y en la oposición del 31 de julio de 2007, "*Pueblo*" ratifica que la propiedad inmueble de "*Pueblo*" que "*Río Grande*" interesa embargar cuenta con unos 7,000 m.c. y radica en el sector del Condado, Municipio de San Juan. En tal lugar, "*Pueblo*" opera su establecimiento comercial denominado "*De Diego*". Del estudio de título fechado el 19 de enero de 2007 y unido en autos, consta que las 8 fincas registrales que componen el predio se encuentran hipotecadas en un total de aproximadamente 23 millones de dólares y el embargo no afectará la operación regular de la sucursal de "*Pueblo*" en "*De Diego*". No obstante, tal gravamen afectará cualquier evolución inmobiliaria de "*Pueblo*" con dicha propiedad.

Tomado ello en consideración, entendemos que debemos modificar el monto de la fianza solicitada a "*Río Grande*", para expedir la orden de embargo por monto de 8 millones de dólares. Resolvemos que el monto de la fianza no debe exceder de $3,000.000.00.

**Dictamen**

Conforme a lo antes expuesto:

1) Denegamos la expedición del auto de *Certiorari* en cuanto al recurso KLCE-2007-01128 y desestimamos su escrito en auxilio presentado por "*Pueblo*".

2) Expedimos el auto de *Certiorari* solicitado por "*Río Grande*" en el expediente KLCE-2007-01120, sólo para modificar el monto de la fianza requerida a "*Río Grande*" para expedir la orden de embargo inmobiliario de 8 millones de dólares contra "*Pueblo*", a la suma de $3,000,000.00.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones